968 F.2d 1224
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff/Appellee,
v.
Larry Dean COOPER, Defendant/Appellant.
UNITED STATES of America, Plaintiff/Appellee,
v.
Donald Ray WEAVER, Defendant/Appellant.
UNITED STATES of America, Plaintiff/Appellee,
v.
Jerry Don ROBINSON, Defendant/Appellant.
 Nos. 90-7050 to 90-7052.
 United States Court of Appeals, Tenth Circuit.
 July 15, 1992.
 
 1
 Before McKAY, Chief Judge, EBEL, Circuit Judge, and KANE,* Senior District Judge.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 JOHN L. KANE, Jr., Senior District Judge.
 
 
 4
 Larry Dean Cooper and Donald Ray Weaver were named as defendants, together with Jerry Don Robinson, in an indictment filed in the U.S. District Court for the Eastern District of Oklahoma on January 4, 1990. Cooper, Weaver and Robinson were charged in Count I with conspiring to possess with intent to distribute and conspiring to distribute amphetamine/methamphetamine, in violation of 21 U.S.C. § 846. In Count II, Cooper, Weaver and Robinson were charged with possession with intent to distribute amphetamine/methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Cooper, Weaver and Robinson were charged in Count III with distribution of amphetamine/methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. In Count IV, Cooper, Weaver and Robinson were charged with possession of a firearm during the commission of a felony (the specific felony being possession with intent to distribute amphetamine/methamphetamine) in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2.
 
 
 5
 In Counts V and VI defendant Robinson was charged with knowingly and intentionally using a communication facility to facilitate the act of possessing with intent to distribute amphetamine/methamphetamine in violation of 21 U.S.C. § 843(b). Cooper and Weaver were not named in those counts. The government alleged that the conspiracy in Count I occurred during the period from December 10, 1989 to December 20, 1989. The acts described in the other counts took place on or about December 19 and 20, 1989.
 
 
 6
 Cooper, Weaver and Robinson were tried before a jury on April 2, 3, and 4, 1990. Before trial, defendant Robinson filed a motion asking that his trial be severed from the trials of Cooper and Weaver, because their defenses would be mutually exclusive and antagonistic. The motion was denied.
 
 
 7
 After opening statements had been given by the government and by the attorneys for Robinson and Cooper, but before the government's first witness took the stand, Robinson's counsel renewed his motion for severance. Both Cooper and Weaver joined in this motion. The motion for severance was again denied.
 
 
 8
 At the close of the government's case, both Cooper and Weaver moved the court for judgments of acquittal on all counts. Those motions were denied.
 
 
 9
 During the defense portion of the trial, Cooper, Weaver and Robinson each took the stand and presented evidence in support of their respective defenses. After the defendants rested, they renewed their earlier motions; those motions were denied.
 
 
 10
 The jury found Cooper and Weaver guilty on Counts I, II, III, and IV. The jury found Robinson guilty on Counts I through VI. The District Court sentenced both Cooper and Weaver to terms of imprisonment of seventy-two months on Counts I, II, and III. Cooper and Weaver were further ordered to serve a term of sixty months on Count IV, with that term to run consecutively to the seventy-two month sentence.
 
 
 11
 Robinson was sentenced to concurrent terms of imprisonment of ninety-six months on Counts I, II, III, V and VI and sixty months on Count IV, to be served consecutively to the ninety-six month sentences. Robinson raised issues concerning departure from the sentencing guidelines, which the district court rejected.
 
 I. FACTS
 
 12
 On June 6, 1989 Allen Rogers was arrested while engaged in the delivery of two pounds of amphetamine. In an effort to seek more favorable treatment, Rogers became an informant. He provided information to federal agents leading to the location of a clandestine amphetamine laboratory on the day following his arrest. He provided additional information resulting in the arrest of other individuals in July, 1989 who were engaged in the manufacture of amphetamines.
 
 
 13
 In the latter part of November, 1989, Rogers advised Agent Michael Holliday of the Drug Enforcement Administration that the defendant, Jerry Don Robinson of Durant, Oklahoma, was a potential source for purchasing amphetamine. Rogers and Robinson had previous drug dealings with one another. Acting undercover in association with Rogers, Agent Holliday negotiated a deal with Robinson to purchase one pound of amphetamine, with an agreement to buy an additional pound.
 
 
 14
 The purchase, arrest and seizure occurred in Durant, Oklahoma on December 20, 1989. The undercover operation began at approximately 1:00. Government agents held a meeting at a McDonald's restaurant across from the site of the amphetamine delivery. They decided that an agent from the Tulsa DEA office, John Salley, and another agent from Dallas would take the informant, Rogers, to defendant Robinson's place of business, the Pic and Save 2, to get a general idea of what it looked like since they were unfamiliar with the Durant area.
 
 
 15
 Several agents set up surveillance of the Pic and Save 2. Other agents followed Agent Holliday and Rogers to a pay phone to monitor Rogers' call to the Pic and Save 2, at about 3:20 p.m. As a result of that phone call, in which Rogers made no threats or coercive statements, Robinson agreed to meet with Rogers and Agent Holliday at a Wal-Mart parking lot to discuss the delivery and purchase of two pounds of amphetamine.
 
 
 16
 Approximately five to ten minutes after the phone call, Robinson arrived at the Wal-Mart parking lot. Agent Holliday and Rogers met Robinson at his pickup. Robinson indicated he had one pound waiting at his store right then and if Agent Holliday liked it, it would take him forty-five minutes or so to "get the other pound of amphetamine." Robinson did not discuss the price at that time, nor was Robinson accompanied by the codefendants Weaver and Cooper.
 
 
 17
 Robinson commented to Agent Holliday that "the money is going to be good for me, the money is going to be good for them." Robinson further stated, when questioned about whether the other individuals would come to the Wal-Mart parking lot to meet with Agent Holliday, that he would check back in about fifteen or twenty minutes. Robinson indicated that other individuals probably would come with him, but that "they would not leave the dope alone with Mr. Robinson." DEA agents Rick Smith and Pete Gronnevick monitored the conversations between the undercover Agent Holliday and Robinson. The entire transaction was being surveilled by other federal agents of ATF and the DEA.
 
 
 18
 Robinson left the Wal-Mart parking lot and returned to the Pic and Save 2, while other agents maintained surveillance. The agents had radio contact with one another as well as a transmitter on Agent Holliday, permitting them to monitor both the conversations at the Wal-Mart and Robinson's activities at the Pic and Save 2.
 
 
 19
 On the second meeting at the Wal-Mart parking lot, Robinson, Cooper and Weaver returned in Weaver's pickup truck. Robinson walked over to Agent Holliday's vehicle carrying a blue and white cooler. Robinson entered the passenger door of the vehicle and Rogers got into the back seat. Robinson handed the cooler to Agent Holliday, indicating that it contained one pound of amphetamine, and that if he liked the quality of the amphetamine Robinson could get another pound within forty-five minutes. After undoing the lid and looking at the amphetamine within the cooler, Robinson offered that "we could do this once a week" or however often the agent wanted, referring to the purchase of amphetamine at later dates. At no time did Agent Holliday or Rogers attempt to coerce Robinson to acquire or deliver the amphetamine, or to accept the $26,000. After inspecting the amphetamine in the cooler, Agent Holliday indicated he would like to get the other pound. At this time Robinson stated that he needed $13,000. Agent Holliday responded that the money was in the trunk. Both exited the vehicle and opened the trunk. Agent Holliday then gave Robinson the briefcase containing the $26,000.
 
 
 20
 There was testimony that Robinson returned to the Pic and Save 2 and immediately had a conversation in front of the store for a couple of minutes with Cooper. Soon thereafter, Weaver arrived in his pickup truck. Robinson and Cooper immediately walked over to Weaver's vehicle, opened the passenger door and engaged him in conversation for a few minutes. Cooper and Robinson entered Weaver's truck, and all three left the area enroute to the Wal-Mart store. The government's evidence was that neither Cooper nor Robinson was seen at the Pic and Save 2 with the blue and white cooler nor were any bulges noticed in their jackets or clothing. The testimony by the government agents was that the conversation between Cooper and Robinson at Weaver's pickup truck lasted a short while. Then both Cooper and Robinson entered Weaver's truck and departed for the Wal-Mart parking lot. This testimony directly contradicted witnesses presented by Weaver to the effect that Cooper and Robinson entered the Pic and Save 2 store and exited to meet Weaver at Weaver's truck.
 
 
 21
 Upon his arrest Robinson said, "what can I do to get out of this?" "I can give you a lab." Cooper, at his arrest, admitted possession of the large revolver and said he always carried a firearm. The handgun was found in the middle of the cab of the pickup truck in which all three defendants rode to the Wal-Mart parking lot. After being advised by Agent Bryand that Cooper was "being arrested for delivering one pound of amphetamine to an undercover agent," Cooper stated he "hadn't delivered any crank to an undercover agent." Crank is a term used to refer to amphetamine. Cooper also stated he did not know what was going on. Both Cooper and Weaver denied any knowledge that a drug transaction was to occur.
 
 
 22
 Robinson presented defenses of entrapment and coercion, alleging approximately six weeks of telephone calls from Rogers coerced and entrapped him. Robinson asserted at trial that on December 19, 1989, Cooper overheard a telephone call that Robinson received from the Rogers. Robinson alleged that Cooper offered to "help me out" by providing Robinson with a quantity of amphetamine. The following day, December 20, 1989, the drug transaction and arrest occurred, resulting in the subsequent trial and convictions of the defendants.
 
 II. SEVERANCE
 
 23
 We first consider whether the trial court erred in denying the several motions for separate trials. The standard for reviewing the denial of a motion to sever is abuse of discretion. United States v. Esch, 832 F.2d 531, 537 (10th Cir.1987), cert. denied, 485 U.S. 908 (1988). The duty of the trial court is to "weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir.1979), cert. denied, 447 U.S. 905 (1980).
 
 
 24
 "An abuse of discretion occurs when a judicial determination is arbitrary, capricious or whimsical. It is not merely an error of law or judgment, but an overriding of the law by the exercise of manifestly unreasonable judgment or the result of impartiality, prejudice, bias or ill-will as shown by evidence or the record of proceedings." United States v. Wright, 826 F.2d 938, 943 (10th Cir.1987). "[D]efendants must show actual prejudice as well as abuse of discretion before a ruling can constitute reversible error." Id. at 945. Clearly, more is required than a showing that separate trials might have offered a better chance of acquittal.
 
 
 25
 We fail to see any abuse of discretion by the trial court in denying severance to this case. The prejudice alleged is that the defendants' proffered defenses were mutually antagonistic because Robinson was essentially admitting the criminal acts and asserting that his participation was the result of coercion and entrapment while Cooper and Weaver were claiming to be innocent bystanders who had no knowledge that a drug transaction was taking place. Even so, the evidence showed proximity in time and place and the circumstances were such as to show by direct observation of the various law enforcement agents that the actions of each were entirely coordinated. Given the facts and the reasons offered by defendants for the severances being of such a routine and general nature, the trial judge was well and safely within the bounds of discretion in denying the several motions.
 
 
 26
 Mere inconsistency of defenses is not, standing alone, sufficient grounds to require severance. Here the defendants were not restricted in presenting evidence to support their defenses. Indeed, from the evidence presented, had the jury believed it, verdicts of not guilty could have been returned as to each defendant. The government, however, is not required to produce evidence consistent with any defense. From a complete review of the record, it is abundantly clear that the jury accepted the government's evidence and rejected that presented by the defendants which was inconsistent therewith. Such is the office of the jury. Upon review, we find that the denial of the severance motions did not result in the denial of any defendant's right to a fair trial. United States v. Butler, 494 F.2d 1246, 1256 (10th Cir.1974).
 
 III. SUFFICIENCY OF THE EVIDENCE
 
 27
 In reviewing a claim of the sufficiency of the evidence we consider the evidence in the light most favorable to the government and will not re-weigh credibility of witnesses. See United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir.), cert. denied, 475 U.S. 1128 (1986). Evidence is considered sufficient if, under this standard, a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Ratchford, 942 F.2d 702, 703 (10th Cir.1991); cert. denied, 112 S.Ct. 1185 (1992).
 
 A.
 
 28
 SUFFICIENCY OF EVIDENCE AS TO DEFENDANT ROBINSON
 
 
 29
 Robinson contends the evidence was insufficient to support his conviction. He alleges the government did not prove beyond a reasonable doubt that he had not been entrapped into committing the offenses. The trial court instructed the jury as to the government's burden when the defense of entrapment was raised by the defendant.
 
 
 30
 "The defense of entrapment has two elements: first, government agents must have induced the defendant to commit the offense; and second, the defendant must not have been otherwise predisposed to commit the offense, given the opportunity." United States v. Fadel, 844 F.2d 1425, 1429 (10th Cir.1988); see also Matthews v. United States, 485 U.S. 58, 63 (1988). Inducement is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." United States v. Ortiz, 804 F.2d 1161, 1165 (10th Cir.1986).
 
 
 31
 The ultimate issue of entrapment is the defendant's predisposition to commit the crime. Here, Robinson's past drug trafficking evidenced his predisposition to engage in the illegal activity. The mere fact that he was contacted on several different occasions by telephone does not support his alleged entrapment by coercion defense. The government's use of undercover agents who buy drugs from defendants, without more, does not constitute entrapment. See, e.g., United States v. Pfeffer, 901 F.2d 654, 656 (8th Cir.1990).
 
 
 32
 Robinson alone determined where to meet and the price for the quantity of drug negotiated. Robinson wanted to consummate the drug transaction at his store, the Pic and Save 2. Agent Holliday and Rogers changed only the location to the Wal-Mart parking lot.
 
 
 33
 The multitude of phone calls can be explained by evidence that Robinson kept putting Rogers off, stating that his contact for the amphetamine supply was apparently a truck driver who was on the road. Robinson placed a telephone call to Rogers and indicated that the deal was on and set for December 20. When Rogers arrived in Durant, he contacted Robinson who agreed to come to the Wal-Mart.
 
 
 34
 Robinson's demeanor and conversance demonstrated that he was "at ease and felt comfortable with the entire deal." At the first meeting with Agent Holliday, Robinson discussed the quantity of amphetamine that he had waiting at his store. He further indicated that if Holliday liked that, it would take him forty-five minutes or so to "get the other pound of amphetamine."
 
 
 35
 The evidence shows there were no threats. Robinson told Holliday "the money is going to be good for me, the money is going to be good for them," referring to his co-conspirators. Robinson also indicated that his compatriots would come with him and that they would not leave the dope behind. A defendant must show a lack of predisposition to commit a crime for the defense of entrapment to succeed. United States v. Heidecke, 900 F.2d 1155, 1162 (7th Cir.1990).[1] Based upon the court's instructions on entrapment and the evidence in the case, a reasonable jury could determine that: (1) Robinson was predisposed to commit the crime when given the opportunity as in the present case, and (2) his defense was unbelievable.
 
 
 36
 Not only does Robinson fail to show entrapment, he fails to establish coercion. "A coercion or duress defense requires the establishment of three elements: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." United States v. Scott, 901 F.2d 871, 873 (10th Cir.1990). No such evidence was presented.
 
 B.
 
 37
 SUFFICIENCY OF EVIDENCE AS TO DEFENDANTS COOPER AND WEAVER
 
 
 38
 Defendants Cooper and Weaver each allege the evidence did not support the convictions for violation of 18 U.S.C. § 924(c)(1). Cooper alleges the evidence was insufficient to show that his gun facilitated or played any role in the drug transaction, nor did the availability of the gun increase the likelihood that the transaction would succeed.
 
 
 39
 We have stated that the "uses" element of § 924(c)(1) is met when the defendant has " 'ready access' " to the firearm and the firearm " 'was an integral part of his criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed.' " United States v. McKinnell, 888 F.2d 669 (10th Cir.1989) (citing United States v. Matra, 841 F.2d 837, 843 (8th Cir.1988)).
 
 
 40
 In the present case, the firearm was located within easy reach of all three defendants in the cab of Weaver's pickup truck. It provided a means of protecting the operation and intimidating those encountered in the course of the drug transaction that day. As guns in the hands of drug dealers are inherently dangerous, § 924(c) imposes severe sanctions for firearms which facilitated, or could have facilitated the commission of certain serious crimes. Section 924(c) merely requires "some relation or connection between the underlying criminal act and the use or possession of the firearm." United States v. Stewart, 779 F.2d 538, 540 (9th Cir.1985). Thus,
 
 
 41
 [i]f the firearm is within possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.
 
 
 42
 Id.
 
 
 43
 In the present case, Weaver's pickup truck was used to transport the firearm as well as the first pound of amphetamine to the Wal-Mart parking lot. In United States v. Cardenas, 864 F.2d 1528, 1535 (10th Cir.), cert. denied, 491 U.S. 909 (1989), we held that when a motor vehicle is used, " 'carrying a weapon' takes on a less restrictive meaning than carrying on the person." Cooper admitted to the agents that he always carried a firearm. A reasonable inference which may be drawn is that his associate, Weaver, was also aware of this fact. Further, as the case involved a conspiracy, Weaver was likewise providing his assistance in furtherance of the drug trafficking offense as driver for Cooper and Robinson.
 
 
 44
 In sum, evidence in the record is more than adequate to support Cooper and Weaver's convictions. The surveillance evidence confirmed Cooper and Weaver's association and involvement with Robinson. Telephone toll records reflected numerous calls between these defendants and Robinson. Federal agents noted that Cooper nervously paced in front of Robinson's Pic and Save 2. Further, Robinson's statements to Agent Holliday that he would have to check with his "people," that he would be back in a short period of time, that they would not leave the drugs, that they would probably return to the Wal-Mart with him, and that the money was good for them, made it clear that other actors were involved. This, coupled with the very short time frame in which all the defendants met at the Pic and Save 2 and returned together to the Wal-Mart store and Robinson's statement to the undercover agent that "if you like this one, I can get the other pound and be back in thirty or forty-five minutes," constituted sufficient evidence upon which a jury could find each defendant guilty beyond a reasonable doubt.
 
 
 45
 IV. THE DISTRICT COURT REFUSED TO EXERCISE ITS DISCRETION IN DEPARTING DOWNWARD FROM THE SENTENCING GUIDELINES RANGE.
 
 
 46
 Robinson further alleges that the district court sentenced him under the erroneous belief that it lacked discretion to depart downward from the sentencing guideline range. Robinson requested departure for an over-representation of his criminal history under Guideline § 4A1.3 and "based on coercion."
 
 
 47
 The issue is whether the trial judge refused to depart downward because he erroneously believed that he had no power to do so. Robinson relies on several statements by the trial judge at sentencing which he argues indicate that the judge believed he had no discretion to make a downward departure. Other passages in the record, however, belie this conclusion.
 
 
 48
 For example, in response to Robinson's request for departure based on an overstated criminal history, the court reasoned,
 
 
 49
 I don't have any discretion just to go outside the guidelines without some legitimate reason--at least you haven't give[n] me any--except you and the other taxpayers don't want to pay [for Robinson's incarceration]. If you think legitimately unless this is something frivolous and you just want to make a good speech, give me some reason to depart; a legitimate reason is not because it's going to cost too much money. If you have some legitimate reason, that's fine; otherwise, it's frivolous. You're wasting our time."
 
 
 50
 (Tr. Vol. II at 11.) (emphasis added). The court's cognizance of its discretion to depart is obvious. The court was aware that reasons for imposing a particular sentence must be stated in the record under 18 U.S.C. § 3553(c). Its comments were an attempt to edify defense counsel that the sentence would be vacated if this section was not complied with. See United States v. Bishop, 921 F.2d 1068, 1070 (10th Cir.1990); cert. denied, 111 S.Ct. 2034 (1991); United States v. Beaulieu, 900 F.2d 1531 1535 (10th Cir.), cert. denied, 110 S.Ct. 3252 (1990).
 
 
 51
 "We presume that refusals to depart are knowing exercises of the District Court's discretion. The court's statement of 'the reasons for its imposition of the particular sentence' required by 18 U.S.C. § 3553(c) need not include the reasons for denying a request for departure." United States v. Lowden, 905 F.2d 1448, 1449 n. 1 (10th Cir.), cert. denied, 111 S.Ct. 206 (1990).
 
 
 52
 In this case, the trial judge refused to exercise his discretion to depart downward. Such a refusal to depart downward from the guidelines range, absent legal error or an incorrect application of the guidelines, is not appealable. United States v. Davis, 900 F.2d 1524, 1529-30 (10th Cir.), cert. denied, 111 S.Ct. 155 (1990).
 
 V. CONCLUSION
 
 53
 For the reasons stated, the defendants' convictions and sentences are AFFIRMED.
 
 
 
 *
 Honorable John L. Kane, Jr., United States Senior District Judge for the District of Colorado, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for the purposes of establishing the doctrines of law of the case, res judicata or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Obviously, it is the defendant's burden to initially come forward with evidence that amounts to a triable issue of entrapment. United States v. Sullivan, 919 F.2d 1403, 1418 n. 18 (10th Cir.1990). Once having done so, the burden shifts to the government to prove predisposition beyond a reasonable doubt. Id